IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff/Respondent,<br><br>　vs.<br><br>JOSEPH DEAN LIRA,<br><br>　　　　Defendant/Movant. | Cause No. CR 10-135-BLG-DMW<br>CV 15-091-BLG-DMW<br><br><br>ORDER GRANTING § 2255<br>MOTION AND SETTING NEW<br>SENTENCING HEARING |

This habeas petition seeks to vacate, set aside, or correct the sentence imposed on Joseph Lira, 28 U.S.C. § 2255. A jury convicted him of drug and firearms offenses. He is currently serving a sentence of 270 months in prison, to be followed by five years' supervised release. *See* Am. Judgment (Doc. 166) at 1; Judgment (Doc. 118) at 3.

Lira claims the United States violated *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), when AUSA James Seykora failed to disclose impeachment information about the government's cooperating witnesses. He also contends that his Sixth Amendment right to the effective assistance of counsel was violated because trial counsel failed to adequately investigate the case or communicate with him, thereby impeding the need to locate and call favorable witnesses at trial. *See* Am. Mot. (Doc. 147) at 1–

1

2.

The parties have conducted discovery and submitted briefs.  Lira does not brief his Sixth Amendment claim.  It is deemed abandoned.  Having reviewed the record of the case, Lira has shown the government's lawyer violated the constitutional mandate of *Brady/Giglio*.

## I.  Background

A grand jury indicted Lira on November 22, 2010.  He was arrested on December 22, 2010.  A superseding indictment charged Lira with five offenses:

| Count 1 | possessing over 500 grams of a mixture or substance containing methamphetamine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; |
|---|---|
| Count 2 | distributing over 500 grams of a mixture or substance containing methamphetamine, a violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; |
| Count 3 | distributing five grams or more of actual methamphetamine, a violation of 21 U.S.C. §§ 841(a)(1) and 2; |
| Count 4 | using and/or carrying and possessing firearms during and in relation to and in furtherance of the drug trafficking crimes alleged in Counts 1 and 2, a violation of 18 U.S.C. § 924(c)(1); |
| Count 5 | being a felon in possession of a firearm, a violation of 18 U.S.C. § 922(g)(1). |

Superseding Indictment (Doc. 24) at 3–5.[1]  Conviction on Counts 1 or 2 would

---

[1]  Counts 1, 2, and 4 occurred between July 2007 and December 22, 2010.  Counts 3 and 5 arose from discrete events, Count 3 on October 23, 2009, and Count 5 on December 22, 2010.  The parties stipulated that Lira was in jail from June 14,

subject Lira to a ten-year mandatory minimum sentence and a maximum sentence of life in prison. *See* 21 U.S.C. § 841(b)(1)(A)(viii).

Trial took place beginning July 25, 2011. Nineteen witnesses testified over a day and a half. The fulcrum of the prosecution's case was cooperating witnesses' testimony. Nearly all testified that Lira sold methamphetamine to support his own use of it, several testified that he frequently carried or used a firearm, and some testified to both. The trial involved two principal issues: whether Lira's predilection for firearms was adequately connected with drug trafficking, and whether he was responsible for more than 500 grams of methamphetamine.

In closing argument, Lira's trial counsel, Brian Fay, summarized his position:

> When I got up here in my opening statement, I told you we don't really dispute that Joe Lira has distributed methamphetamine or that he has possessed it with the intent to distribute it. . . . [H]e is clearly guilty of both Count I and Count II.
> . . . [Y]ou need to unanimously find, beyond a reasonable doubt, an amount that Joe Lira possessed in Count II or he possessed with the intent to distribute in Count I. And your options will be, Did he possess more than 500 grams?
> . . .
> And so, ladies and gentlemen of the jury, I submit to you that you should find Joe Lira guilty of Count I and guilty of Count II and determine that the government, at best, at most, on its best day, has proved that Joe Lira distributed or possessed with intent to distribute 4 ounces of methamphetamine. And . . . you should find the defendant

---

2007, to November 27, 2007; from June 17, 2008, to April 15, 2009; and from April 22, 2010, to September 21, 2010. See 2 Trial Tr. (Doc. 95) at 152:21–153:2. The total time period of the indictment, therefore, was about 21 months.

Joe Lira not guilty of Count III, Count IV, and Count V.

3 Trial Tr. at 360:14–17, 360:22–361:1, 372:17–24.

After deliberating for about six hours, the jury found Lira guilty on Counts

1, 2, and 3, the drug counts.  As to Counts 1 and 2, it found Lira responsible for

500 or more grams of a substance containing methamphetamine.  It also found him

guilty on Count 4, the charge under 18 U.S.C. § 924(c), but acquitted him on

Count 5, the felon-in-possession count.  *See* Jury Verdict (Doc. 75) at 1–5.  Count

3 is not at issue in the pending § 2255 motion.

## II.  Analysis

### A.  *Brady* and *Giglio*

"[S]uppression by the prosecution of evidence favorable to an accused . . .

violates due process where the evidence is material either to guilt or to

punishment."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The prosecution must

disclose to defense counsel evidence in its possession or control if the evidence is

favorable to the defense.  The duty is constitutional.

In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court

considered whether *Brady* also requires disclosure of impeachment evidence.  The

question arose when, sometime after trial, the defendant's trial counsel "discovered

new evidence indicating that the Government had failed to disclose an alleged

promise made to its key witness that he would not be prosecuted if he testified for

4

the Government." *Id.* at 150-51.  The Supreme Court held that the United States'

failure to disclose its promise violated the defendant's constitutional right to due

process.  *See id*. at 153-55.

"The importance of cross-examination . . . is to reveal a witness' state of

mind and, more particularly, the extent of the witness' incentive to testify to the

government's satisfaction."  *United States v. Larson*, 495 F.3d 1094, 1110 (9th Cir.

2007) (en banc) (Graber, J., concurring in part and specially concurring) (a District

of Montana case).  Counsel for the defendant must be allowed not only to ask

"*whether* the witness was biased but also to make a record from which to argue

*why* the witness might have been biased."  *Id.* at 1102 (majority op.) (internal

quotation marks and brackets omitted) (quoting *Davis v. Alaska*, 415 U.S. 308, 318

(1974)).  Counsel cannot make that record, and the jury cannot fairly and

accurately evaluate the evidence, when the United States fails to disclose relevant

impeachment information within its possession.

"[M]ateriality . . . is not a sufficiency of evidence test."  *Kyles v. Whitley*,

514 U.S. 419, 434 (1995) (explaining *United States v. Bagley*, 473 U.S. 667

(1985)).  "One does not show a *Brady* violation by demonstrating that some of the

inculpatory evidence should have been excluded, but by showing that the favorable

evidence could reasonably be taken to put the whole case in such a different light

as to undermine confidence in the verdict."  *Id*. at 435.  The analysis must also take

into account "the cumulative effect of all . . . evidence suppressed by the government." *Id.* at 421.

The question is whether a reasonable juror, exposed to all the trial evidence as well as the previously-undisclosed evidence, would, to a reasonable probability, retain reasonable doubt as to Lira's guilt on one or more counts or as to a threshold drug quantity. *See Turner v. United States*, __ U.S. __, 137 S. Ct. 1885, 1893 (2017); *Cone v. Bell*, 556 U.S. 449, 470 (2009). The trial is viewed from the perspective of a reasonable juror who has not yet decided the case and who applies the presumption of innocence, holds the prosecution to its burden of proof, and otherwise follows the judge's instructions.

### B. Nicholas Kojetin

#### 1. Evidence Relevant to Kojetin's Credibility

Kojetin was one of seven cooperating witnesses the United States called to testify against Lira. Lira argues that Kojetin's attorney, Vernon Woodward, reached a "meeting of the minds" with the prosecutor, former Assistant United States Attorney James Seykora, to reduce Kojetin's sentence to time served if Kojetin testified for the prosecution. The evidence supports this characterization.

Kojetin was charged and sentenced before Lira was indicted. On May 5, 2010, Kojetin appeared before Senior United States District Judge Jack D. Shanstrom and pled guilty to conspiracy to possess ecstasy with intent to distribute

it.  *See* Minutes (Doc. 26), *United States v. Kojetin*, No. CR 10-07-BLG-JDS (D.

Mont. Jan. 25, 2010).  The charge itself was a benefit because Kojetin also

trafficked in marijuana, cocaine, and methamphetamine.  *See* 2 Trial Tr. at 172:9–

20 (direct examination by prosecutor), 185:21–186:9, 194:25–195:11 (cross-

examination by Lira's counsel).  Before sentencing, Seykora filed a motion to

reduce Kojetin's sentence under U.S.S.G. § 5K1.1 to reflect his cooperation with

investigators.  Senior Judge Shanstrom reduced Kojetin's advisory guideline range

from 27 to 33 months to 21 to 27 months and imposed a sentence of 24 months in

prison, to be followed by three years' supervised release.  *See* Judgment (Doc. 38)

at 1–3, *Kojetin*, No. CR 10-07-BLG-JDS.

On June 16, 2011, a little more than a month before Lira's trial, Woodward

emailed Seykora regarding "Nick Kojetin."  Woodward said:

> I received a call from Nick this morning.  He is officially "in transit"
> and called from Shelby.  I suspect you have summoned him[2] to testify
> against Joe Lira.  You need to know that Nick has had a terrible time in
> custody because he was a snitch . . . . He has been beaten and has been
> in PC [protective custody]—which is essentially solitary.
>> He says that cooperating with the government was a big mistake.
> I am not comfortable thinking that he will be a beneficial witness for
> you.
>> Please call us.

Woodward Email June 16, 2011 (Doc. 210-9, 211-1) at 1.

---

[2]  Kojetin had been incarcerated at the Federal Detention Center in Seatac,
Washington.  *See* 2 Trial Tr. at 185:15–20.

On July 22, 2011, the Friday before trial commenced on Monday,

Woodward told Seykora:

> I trust that a Rule 35 motion will be filed in return for Nick putting his safety at issue by testifying against Mr. Lira.  Please let me know.

Woodward Email July 22, 2011 (Doc. 210-10, 211-2) at 1.

Woodward testified in deposition that he could "tell you for damn certain"

that Seykora "said. . . . [i]f Nick testifies truthfully, I will file a Rule 35."

Woodward Dep. (Doc. 210-8, 211-14) at 27:17–19.  Referring to sentence

reduction motions in general, including motions under U.S.S.G. § 5K1.1,

Woodward continued:

> [T]ypically that is the assumption, that you [the United States] will—if my client does what you want, you will do the honorable thing and file the 5K.  And there's never any agreement, not even in the proffer letters that says, you know, There's no understanding, blah, blah, blah, but everyone operates under the assumption that there will be a reward for cooperation.
>
>      [I]n my mind, we were going to get a time-served motion. . . . Whether that was because of a wink and a nod or a formal agreement or just relying on Jim [Seykora], I don't know.

*Id*. at 40:8–15, 42:14–19.

Kojetin testified at Lira's trial on Tuesday, July 26, 2011.  He told the jury

he had pled guilty to distributing ecstasy, agreed to cooperate with the prosecution,

had already received a sentence reduction in exchange for his cooperation, and had

seven months' time left to serve.  *See* 2 Trial Tr. at 171:15–172:4.  He testified that

he sold "little quantities" of methamphetamine to Lira and used methamphetamine

with him.  *See, e.g.*, *id*. at 172:5–174:15, 179:4–180:14, 190:8–191:8.  Kojetin also

said Lira frequently carried a gun but equivocated about its nexus with drug

trafficking.  *See, e.g.*, 2 Trial Tr. at 174:21–178:4, 184:8–18, 198:11–20, 199:3–12,

199:3–12, 200:11–18.  On cross-examination, he agreed he received a "free pass,"

that is, "immunity," for distributing cocaine, marijuana, and methamphetamine.

*See id*. at 194:25–195:11.  Kojetin's testimony was less certain than he seemed to

have said previously.  *See, e.g., id*. at 180:25–184:18.  He also said he had "heard

of" a Rule 35 motion and knew what it was.  Asked whether the prospect of a Rule

35 motion "affected your testimony here today at all," Kojetin responded, "No."

*Id*. at 197:22–198:8.

At 10:41 a.m., roughly an hour after Kojetin finished testifying, the clerk

filed an order entered in Kojetin's case by Judge Shanstrom.  Judge Shanstrom *sua*

*sponte* recused himself from Kojetin's case and reassigned it to Judge Cebull, who

was presiding at Lira's trial.  *See* Order of Recusal and Reassignment (Doc. 42) at

1, *Kojetin*, No. CR 10-07-BLG-RFC.  As no order had been entered in *Kojetin*

since October 1, 2010, issuance of this order indicates that one or both parties

communicated to at least one judge the fact that a Rule 35 motion would be filed

for Kojetin and a quick ruling was desired.

The jury returned its verdict against Lira at about 4:40 p.m. on Wednesday,

July 27, 2011.

The next day, at 9:36 a.m., Seykora filed a Rule 35 motion in Kojetin's case. *See* Rule 35 Mot. (Doc. 43), *Kojetin*, No. CR 10-07-BLG-RFC.  An in-chambers conference was set for 2:00 p.m. the same day.  *See* Order (Doc. 44).

At 12:48 p.m., Seykora emailed two attorneys at the Federal Bureau of Prisons.  Acknowledging that BOP "prefers" to discharge inmates from their designated prison facilities rather than from temporary local custody, Seykora explained that he anticipated Kojetin's sentence would be reduced to time served and asked what he needed to do to "make sure [Kojetin] will be released here [in Montana] without going back [o]nto an airlift or back to SEATAC."  Seykora Email July 28, 2011 (Doc. 211-6) at 1.

At 2:00 p.m., Seykora, Kojetin, and Woodward appeared for the in-chambers conference on the Rule 35 motion.  *See* Minutes (Doc. 45), *Kojetin*, No. CR 10-07-BLG-RFC.  Kojetin's prison sentence was reduced to time served, and his term of supervised release was increased from three years to four.  *See* Am. Judgment (Doc. 46) at 1–3, *Kojetin*, No. CR 10-07-BLG-RFC.

The next day, July 29, 2011, Seykora emailed Marshals Service officials in Montana.  He said:

> Tim:  I have just been called by counsel for Nicholas Kojetin, and told that he is now in Shelby.  At the conclusion of his testimony Tuesday the FBI communicated with the USM to assure that he would stay in Billings and not go to Shelby.  Judge Cebull was told that before he heard and granted the sentence reduction motion yesterday.  I learned about 40 minutes ago that he was put on the transport today and that the

> USMS received a message from BOP that he can be released.  I was told he would be released in Great Falls at the Cascade facility today.  This is a real issue.  Where is he??  Please let me know ASAP.

Seykora Email July 29, 2011 (Doc. 211-5) at 1.

Evidently, Kojetin was successfully located and discharged.  A later-filed document in his case indicated that his term of supervised release began on July 28, 2011.  *See* Request for Early Termination (Doc. 49) at 1.[3]

### 2.  Findings

Based on this evidence, there is no doubt Woodward and Seykora tacitly agreed that Seykora would file a Rule 35 motion to reduce Kojetin's sentence, most likely to time served, if Kojetin testified more or less consistently with his pretrial statements.  Seykora did not tell Fay that he intended to or probably would file a Rule 35 motion to reduce Kojetin's sentence to time served.

Woodward, Seykora, and Fay all knew that "there's never any [formal] agreement . . . but everyone operates under the assumption that there will be a reward for cooperation."  As Woodward said, "[W]hy would I have my client cooperate with the Government if there wasn't some understanding that there would be a benefit to him?"  Woodward Dep. at 36:10–13.  And as Seykora said, "It would be counterproductive if somebody testified . . . and you didn't give them

---

[3] This document erroneously reflected that Kojetin's prison term was 24 months and his term of supervised release was three years.

11

a break . . . . How many people in the future would cooperate in a case you asked them to?"  Seykora Dep. (Docs. 210-12, 211-11) at 71:22–72:1.

Detailed knowledge of the discussions and the tacit agreement between Seykora and Woodward about Kojetin could alter a juror's view of his credibility. Kojetin's situation was not hidden or unknown or misrepresented to the jury but the totality of the story was undisclosed.  The explicit or implicit promises about what reward he would get was not disclosed, e.g. "get out of jail."  The jury heard he had seven months left in his 24-month prison term, and knew that he at least claimed to have been assaulted for being a snitch.  The jury did not hear about a sentence of time served.  The difference between what the jury knew and what it might also have learned is questionable whether it would have altered the view of Kojetin, even when weighed cumulatively with other undisclosed information.

As to Kojetin, Lira has shown the United States withheld exculpatory or impeaching information but has not shown it likely would have altered the jury's evaluation of his credibility.

**C.  David Vinson**

**1.  Vinson's Trial Testimony**

Vinson testified on the first day of trial, Monday, July 25, 2011, about his relationship with Lira for a month or two in 2008.  Vinson did not recall the timing, but Lira was arrested on an unrelated charge on June 17, 2008, and spent

the remainder of the year in jail.  *See* 1 Trial Tr. at 137:17–23; 2 Trial Tr. at 152:24.

Vinson testified that he received "[o]unces and anything up to pounds or quarter pounds" of methamphetamine, "[a]s much as I wanted," from a Spanish-speaking supplier.  *See* 1 Trial Tr. (Doc. 94) at 126:7–19, 127:9–13.  Vinson turned his supply over to Lira and one other person, *see id.* at 127:12–14, but when the other person "worked his way in with the [Mexican] gang," Vinson supplied only Lira, *see id.* at 128:6–129:5.  Vinson said he sold Lira "[h]alf ounce, ounce" quantities for cash "[o]nce, maybe twice a day" for "[a] month, two months maybe."  Considering Vinson's testimony, one half an ounce once a day for a month is fifteen ounces, or 425 grams.

Vinson told the jury he received "a use immunity letter," provided information, wore a wire, and set up deals for the FBI, but was not charged with any crime.  *See* 1 Trial Tr. at 130:4–131:9, 136:2–4, 137:8–16.  Lira's counsel showed the immunity letter to the jury in cross-examination.  *See id.* at 136:5–23.  In redirect examination, Seykora asked Vinson whether the use immunity letter "means what you say would not be used against you so long as you told the truth, right?"  Vinson responded, "Correct."  *Id.* at 138:17–24.

In cross-examination, Fay established that the other cooperating witnesses had never heard of David Vinson.  *See* 1 Trial Tr. at 121:6–11; 2 Trial Tr. at

196:2–8, 228:10–13, 251:21–252:16.

## 2. Undisclosed Information about Vinson

Except where otherwise indicated, the parties agree the following information was not disclosed to Fay before trial.

In August and September 2009, a joint state and federal drug intercession task force enlisted Vinson as an informant.  For making one controlled buy, the task force paid Vinson $2,000.  He was paid $50 each for four recorded phone calls and $100 for other information.  He was terminated from the program because he "had been making telephone calls to Billings Municipal Court Judge Mary Jane Knisely to have traffic warrants dropped."  Lira Br. (Doc. 211) at 6; *see also id*. n.5.  He claimed he was driving on a suspended license for "operational purposes," U.S. Br. (Doc. 210) at 5, to "gather intelligence," Lira Br. at 6.[4]

The FBI also enlisted Vinson as an informant in the fall of 2009, under the alias "Shifty."  He placed one recorded phone call.  The FBI did not pay Vinson or give him any other benefit for the phone call.  *See* U.S. Br. at 6; Lira Br. at 6–7.

But Seykora gave Vinson a considerable benefit—immunity.  On August 31, 2009, Seykora wrote a letter guaranteeing Vinson that "the United States does not intend to prosecute you based on Title 21 U.S.C. violations which may be revealed

---

[4]  Lira's brief relies in part on counsel Bazant's notes from Vinson's informant file. She was not permitted to retain a copy of the file.  *See* Lira Br. (Doc. 211) at 5 n.3, 6 n.5.   The United States does not dispute the accuracy of her notes.

and upon which prosecution could be based as a result of your debriefing." The letter stated that immunity would not extend to violations of perjury statutes, to false statements, or to crimes of violence. The letter also referenced an agreement among Vinson, his attorney, and the United States that "should you provide false or misleading information, then, in that event, there is no use immunity." Vinson Immunity Letter (Doc. 213-2) at 1. It appears that this is the immunity letter disclosed to Lira's trial counsel and shown to the jury. Vinson signed and dated it on September 2, 2009. *See id.*

At trial, Detective Jamie Schillinger testified that Vinson provided "[v]ery valuable" information in the fall of 2009, "not only up the chain but down the chain" of participants, in exchange for use immunity. *See* 1 Trial Tr. at 51:4–53:8. Agent Kuretich of the FBI noted that "the AUSA is in communication and participation with [Vinson's] development." Lira Br. at 7. Both Detective Schillinger and Agent Kuretich agreed that Vinson's 2009 debriefing "should have been documented." Kuretich Dep. (Docs. 210-11, 211-9) at 26:12–14; *see also* Schillinger Dep. (Docs. 210-3, 211-8) at 70:20–71:17, 75:4–11. But, in fact, neither party has located any record at all – such as a 302 report, grand jury testimony against persons other than Lira, or notes in a file – memorializing the "very valuable" information Vinson provided to agents when he debriefed in 2009

exchange for use immunity. *See* Lira Br. at 5 nn.2, 4.[5]

On December 10, 2009, the FBI terminated Vinson as an informant because he was "unproductive." *See* Kuretich Dep. (Doc. 210-11, 211-9) at 15:23–16:15. The joint task force again turned to Vinson for help and signed him up in 2010, but there is no indication he did any work or received any benefit. The task force later "deactivated" him as an informant. *See* U.S. Br. (Doc. 210) at 5–6.

On July 9, 2010—seven months after Vinson's termination by the FBI, and a little more than a year before Lira's trial—the U.S. Attorney's Office in Billings received a handwritten letter from Vinson. He was incarcerated at the Yellowstone County Detention Center on municipal charges. The envelope was addressed to "U.S. Attorney Jim Seykora." The letter said:[6]

> Dear Mr Seykora
>
> I am writing in regards to this upcoming trial of the 2 mecican nationals I don't even know there names Jaime Shillenger said you may be down this week to go over some evidence but maybe they will change there plea but I would asume that the one will try to get the other one off by the sounds of it. Whether you show up her or not I am writing you to ask for a commitment to Warm Springs there are to many people here

---

[5] This information would be relevant and valuable to Lira if Vinson purported to tell everything he knew at the time but gave a lot of information that did not pan out, or did not say the same things he "remembered" about Lira at trial, or did not mention Lira at all. If Vinson's information in 2009 was consistent with his testimony against Lira, it seems likely the United States would have produced it in this proceeding. *See, e.g.*, Schillinger Dep. (Docs. 210-3, 211-8) at 50:16–52:3, 75:4–17.

[6] The following quotation copies the letter's spelling and punctuation but standardizes capitalization to enhance readability.

that you may indict at a later date like JOE LIRA – LARRY KOPP I'm asking for the commitment for a number of reasons the main is so that I can work on my health isues I have COPD and that has been bothering me lately and the DIABETES is another health issue I'm also afraid for my life in this place were so many of the. Conspirtor's are coming together I also have some serious mental health issues that I can work on while Im there —> OVER

Im thinking you would want a healthy alive witness than a dead one but Im not sure it seems like Im nothing to you know.  I don't know whats going on all the different people that were involved the Spanish Speaking ones who I did'ent understand. What Im saying is Im here to assist you in any way I can to remember people and places from three years ago.  Im asking for this commitment because its going to help me physically mentally emotionally Im 55 years old and not very healthy I had a heart attack 6 years ago.  Im just trying to get threw this.  I have 5 kids I love and adore very much they really havent seen me much since the buy went down at the house but I really would like to change that.  Can you try to help me and in the return Im there if you  need me. Please write a small return letter and let me know if you can help

thank you<br>David Vinson

Vinson Letter (Doc. 210-1, Doc. 211-4) at 1–2.  There is no evidence that anyone in the U.S. Attorney's Office or in the FBI responded to this letter.[7]

Four months later, on November 8, 2010, Seykora wrote a memo to Kris McLean and Joseph Thaggard, the Chief and Deputy Chief of the Criminal Division of the United States Attorney's Office in Montana, respectively.  He proposed an indictment against Lira as "part of the Tanya Marie NAVA

---

[7] The United States asserts that the lack of response means the letter is irrelevant, and Lira claims it must have prompted someone in the prosecution team to reach out to Vinson. Either way, the analysis and outcome here would not change. Neither the prosecutor's nor the agents' subjective intent is relevant.

conspiracy."  By not proposing a conspiracy charge, the memo evidently

acknowledged the difficulty of proving that Nava and Lira had a regular supplier-

distributor relationship, or a meeting of the minds.  *See* Prosecution Mem. (Doc.

213-3) at 4–5.  The memo identified potential witnesses (not including Vinson),

forecast a sentencing guidelines base offense level of 26, and estimated advisory

guideline ranges of 78 to 97 months without acceptance of responsibility, or 57 to

71 months with it, plus a mandatory minimum five-year sentence for a charge

under 18 U.S.C. § 924(c).  *See* Prosecution Mem. (Doc. 213-3) at 2–4, 6–7.  In

2010, a base offense level of 26 corresponded to 50 to 200 grams of

methamphetamine, or five to 20 grams of actual methamphetamine.  *See* U.S.S.G.

§ 2D1.1(b)(7) (Nov. 1, 2010).

Whether by design or coincidence, the next day, November 9, 2010,

Kuretich, Schillinger, and another officer "went to the Yellowstone County

Detention Facility," and "the staff brought over David Vinson . . . to speak with the

agents."  FBI Investigation Report ("FBI 302") (Doc. 213-1 at 18).  The report of

this interview was disclosed to Fay.  It referred to Vinson's previous dealings with

Kuretich and Schillinger in 2009 and the fact that he "was given an Use of

Immunity [sic] at that time."  FBI 302 (Doc. 213-1 at 18 para. 1).  Apparently with

the understanding that the immunity letter of August 31, 2009, would continue to

protect him from prosecution, Vinson "agreed to speak to the agents."  *Id*.  His

reported statements at this time were consistent with the testimony he gave at trial. The report describes him as saying that, beginning in May 2008, he received methamphetamine and redistributed it to others, including Lira.  *See* FBI 302 (Doc. 213-1 at 18 para. 4).  "Around June 2008," he "introduced Joe Lira to the 'Mexicans' and also continued to sell methamphetamine to Lira."  *Id.* (Doc. 213-1 at 19 para. 3).  Vinson claimed he "easily sold 500 grams of methamphetamine to Lira and it was more like several pounds."  *Id.*

On November 22, 2010, a grand jury indicted Lira, including, in Counts 1 and 2, a charge that he was responsible for more than 500 grams of methamphetamine.  *See* Indictment (Doc. 1) at 2–3.  Essentially the same charge was repeated in the superseding indictment.[8]  *Compare id*. *with* Superseding Indictment (Doc. 24) at 3.

On March 18, 2011, more than four months before trial, Lira's counsel requested informant files.  *See* Def. Mot. for Exculpatory Evidence or *Brady* Material (Docs. 16, 17).  Seykora responded:

> If the government intends to call an informant or cooperator that was signed up as either a confidential informant, cooperating source, confidential human source or other nomenclature, then those files will be reviewed by the prosecutor for exculpatory, *Brady* and/or *Giglio* material.  The file will not be turned over, but if such material exists it will be provided to the defendant in another format or given to the court

---

[8]  The superseding indictment pushed back the beginning date of Counts 1 and 2 from January 1, 2008, to July 2007.  This amendment does not appear to be relevant to anything presently at issue.

to review in camera.

U.S. Resp. (Doc. 18).  Judge Cebull, who later presided at trial, found that this was "a reasonable procedure to ensure the production of exculpatory or impeachment evidence" and, to that extent, granted Lira's motion.  *See* Order (Doc. 26) at 2.

Seykora provided Fay with Vinson's immunity letter and the FBI 302 from Vinson's interview on November 9, 2010.  Seykora did not disclose the three occasions in 2009 and 2010 when Vinson was "signed up as . . . a confidential informant."  He did not disclose the letter Vinson wrote to him in July 2010.  And he did not disclose any report or information about what Vinson said when he was granted use immunity and debriefed in 2009.

### D.  Materiality of the Undisclosed Information

The final step in the analysis is to consider all the undisclosed information together with the trial testimony to determine whether it can "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles*, 514 U.S. at 435; *see also id*. at 421.

Vinson's letter to Seykora was relevant material and valuable impeachment information.[9]  While the letter does not show "a *quid pro quo* deal struck between

---

[9]  Seykora testified in deposition that he does not recall reading the letter.  It is stamped "received" on July 9, 2010, by the United States Attorney's Office in Billings.  In the course of this proceeding under § 2255, current counsel for the United States located it in the file of Tanya Marie Nava.  *See* U.S. Br. (Doc. 210) at 4, 31; *see also* Schillinger Dep. (Docs. 210-3, 211-8) at 70:20–73:25 (explaining

Vinson and Seykora." U.S. Br. at 31, it does show that Vinson *invited* Seykora to strike a *quid pro quo* deal with him. He almost offers to "remember" whatever "people and places from three years ago" Seykora might need him to remember: "What Im saying is Im here to assist you in any way I can to remember people and places from three years ago." Vinson Letter at 2. If disclosed, his letter would not merely have allowed Lira's counsel "to make a record from which to argue why the witness might have been biased." *Larson*, 495 F.3d at 1102 (quoting *Davis*, 415 U.S. at 318) (emphasis omitted). With proper authentication, the letter *was* "a record from which to argue why the witness might have been biased." More likely than not he was biased.

That is not all. Vinson's "deactivation" as "unproductive" in December 2009 might mean he had nothing new to say in July or November 2010 about his relationship with Lira in 2008. So the letter also raises the question of what, exactly, Vinson said about Lira in the fall of 2009. The United States claims there

---

that information about Vinson might be found under a number associated with Nava). The letter does not mention Nava at all, only Lira and Larry Kopp, so it must have been read by someone who understood its factual context well enough to decide to put it in her file. Nava was indicted on the same day as Lira, with Larry Kopp as a co-defendant. *See United States v. Nava*, Cause No. CR 10-134-BLG-RFC (D. Mont. Nov. 22, 2010). The United States discussed Nava's activities in detail in its case-in-chief against Lira, and Nava testified for Lira at his trial. But, regardless of whether Seykora read the letter or not, he had a constitutional obligation to read it and disclose it to any defense lawyer cross-examining Vinson.

is no record memorializing the "very valuable" information Vinson provided in

2009, "not only up the chain but down the chain."  Consequently, there is no

evidence that Vinson ever mentioned Lira at all in 2009.  A reasonable juror would

find that omission significant and inconsistent with Vinson's trial testimony

incriminating Lira.

Additionally there is the work Vinson did as a "signed-up" informant.  The

jury heard testimony about how dangerous it can be for a drug trafficker to testify

against others.  *See, e.g.*, 2 Trial Tr. at 178:14–179:3; *see also id*. at 196:9–20.

Seykora presented Vinson as someone willing to take the risks in order to protect

himself from prosecution, implying that he was so extensively involved in the drug

trade that he would face a very long sentence in federal prison.  Vinson testified,

after all, that he could get "as much [methamphetamine] as [he] wanted."  1 Trial

Tr. at 127:9–11.  In closing argument, Seykora suggested Vinson perched so high

in the hierarchy that people lower down had never even heard his name.  *See* 3

Trial Tr. (Doc. 96) at 355:15–356:3.

Contrast this supposed secret conduit of Mexican methamphetamine with the

person who tells a city judge he should be allowed to drive on a suspended license

for "operational purposes," or the person who calls on a federal prosecutor for a

commitment to Warm Springs when he is jailed on traffic warrants, *see* City

Documents (Doc. 210-2) at 2–11.[10]  Contrast the claimed high-level trafficker who could get "as much [methamphetamine] as I wanted" to someone who was taking $50 for a recorded call and $100 for information.  An informant who takes $2,000 for a controlled buy appears willing to risk physical injury if it means he can get his hands on a wad of cash.

A juror, even one who learned Vinson's FBI moniker was "Shifty," might have believed his testimony.  A juror could have believed Vinson wanted to get out of jail because he provided valuable evidence against co-conspirators who were in jail with him.  But a reasonable juror aware of Vinson's record as an informant, his "on again off again" relationship with the task force and FBI, as well as his begging letter to Seykora, would likely view Vinson's testimony with suspicion and require independent corroboration of his testimony.  The United States' niggling view of the undisclosed information about Vinson is without merit.

Vinson's testimony was critical to the United States' case.  As explained above, the jury found Lira responsible, with respect to Counts 1 and 2, for more than 500 grams of methamphetamine.  *See* Jury Verdict at 2, 3.  Without Vinson it is likely the government's proof of quantity would have been deficient.

Five hundred grams of methamphetamine is 17.6 ounces, more than a

---

[10]  Vinson was again facing municipal charges around the time he testified against Lira.  *See, e.g.*, City Documents at 20–22.

pound.  Tyler Marr estimated he received a total of two or three ounces from Lira in the fall of 2009.  *See* 2 Trial Tr. at 250:9–13; *see also id*. at 235:9–22.  Melissa Dunning said she received one ounce, in 2007 or 2008, from someone who told her it came from Lira.  *See id*. at 224:17–225:11, 227:9–20.  Travis Van Schaick said he received "maybe an ounce total" from Lira over about 14 months.  He described Lira as selling "[l]ittle bits here and there."  The largest amount he ever saw in Lira's possession at one time was about seven grams, and "[h]e was using most of it."  *See id*. at 262:9–15, 264:1–5, 264:17–23, 265:17–18, 269:6–8.  Nicholas Kojetin testified that Lira distributed "little quantities," used a lot, and received about half an ounce from Kojetin.  *See id*. at 172:11–173:18, 174:5–15, 189:15–17, 190:8–191:8, 193:21–24.  One witness not involved in drug trafficking, Raymond Bosick, testified that, on November 27, 2010, at about 1:00 in the morning, he saw Lira in his vehicle, parked in Bosick's parking spot and holding in his lap a sandwich baggie containing a golf-ball-sized amount of methamphetamine, *see id*. at 212:5–12,[11] presumably about an ounce.  Taking the higher cumulative figure

---

[11]  On July 20, 2011, five days before trial, Lira's counsel filed a motion in limine seeking to exclude Bosick's testimony.  At that time, he anticipated the United States would call Bosick to testify that Lira called him a snitch and shot at him.  Counsel moved to exclude the testimony because there was no connection between the incident and drug trafficking, as necessary to support its admission as to Count 4.  *See* Def. Mot. in Limine (Doc. 55) at 3–4.  The United States' trial brief, filed the same day as the motion in limine, asserted, "The evidence will show that Lira always had handguns and . . . did not hesitate to use them . . . .  includ[ing] firing at individuals who he believed were talking to law enforcement about him so as to

supported by these witnesses' testimony, Lira was responsible for about six and a half ounces of a substance containing methamphetamine, or about 185 grams.

To establish the remaining 315 grams, the United States had no witness other than Vinson.  His testimony created the only point at issue in Counts 1 and 2.

## IV.  Remedy

Lira has not made a case to vacate or set aside his convictions.  But he has shown that lower maximum and minimum penalties should have applied at sentencing.  He is entitled to a new sentencing hearing.  Absent persuasive corroborating evidence, the Court will not consider Vinson's testimony in determining the appropriate base offense level.  There are too many reasons to disbelieve it.

In addition, the United States did not distinguish occasions when Lira distributed methamphetamine from occasions when he possessed methamphetamine with intent to distribute it.  Neither the evidence nor the jury instructions ensured the verdicts on Counts 1 and 2 rested on different acts.  Lira

---

protect his distribution of methamphetamine and possession with intent to distribute methamphetamine."  Trial Br. (Doc. 56) at 5–6.  Bosick gave two statements at the time of the shooting in November.  He had testified against others in the 1990's.  *See* 1 Trial Tr. at 11:15–13:8; 2 Trial Tr. at 217:4–20.

Two days later, in response to the motion in limine, the United States said, "It was learned this afternoon in a debriefing [with Bosick] that Lira had a ball of methamphetamine in his lap and this witness observed it prior to being shot at by Lira.  This is definitely drug related."  Resp. to Mot. in Limine (Doc. 62) at 4.

cannot be sentenced on both Count 1 and Count 2. *See United States v. Palafox*, 764 F.2d 558, 564 (9th Cir. 1985) (en banc).

Accordingly, IT IS ORDERED:

1.    Lira's motion to vacate, set aside, or correct the sentence (Docs. 134, 147) is DENIED as to his conviction and GRANTED as to his sentence.

2.    The Second Amended Judgment (Doc. 166) and Amended Judgment (Doc. 118) are VACATED.

3.    The United States Marshals Service shall transport Joseph Dean Lira, BOP # 07563-046, to the District of Montana for a new sentencing hearing.

4.    Pursuant to 18 U.S.C. § 3006A(a)(1)(A), Lisa Bazant is APPOINTED to represent Lira at sentencing.

5.    Sentencing is set for **May 27, 2021, at 9:00 A.M.**, in the Russell Smith Courthouse, Missoula, Montana.

6.    The United States Probation Office shall conduct a supplemental presentence investigation in accordance with Fed. R. Crim. P. 32(c) and 18 U.S.C. § 3552(a) and shall revise the guideline calculation consistent with this Order.

7.    Following completion of the supplemental report, the probation officer shall disclose the report (excepting any recommendations of the probation officer) to the defendant, counsel for the defendant, and counsel for the government no later than **April 12, 2021**.  The probation officer shall not disclose,

directly or indirectly to anyone under any circumstances, the substance or contents of any recommendation made or to be made to the Court.

8.      In cases where restitution is mandatory, the probation officer shall consider a payment plan with the Defendant and make recommendations to the Court concerning interest and a payment schedule.

9.      In accordance with USSG §6A1.2, after receipt of the presentence report and no later than **April 26, 2021**, counsel for each party shall present to the probation officer, in writing, any objections to be relied upon at sentencing and, if there is a dispute over any material in the presentence report, counsel shall meet with the probation officer and attempt to resolve disputes informally by diligent good faith effort.  Any requests for extensions of time to present objections to the probation officer must be granted by the Court.  Extensions will not be granted absent compelling reasons.

10.     The defendant shall present the probation officer with a written letter of acceptance of responsibility, if any, no later than **May 6, 2021**.  Late acceptance letters will not be considered without leave of Court.  *But see* Fed. R. Crim. P. 32(i)(4)(A)(ii) (recognizing that the defendant has the right to address the Court orally at sentencing).

11.     The presentence report, in final form, shall be delivered to the Court and the parties no later than **May 12, 2021**.

12.     If the objections made pursuant to ¶ 5 are not resolved and counsel wishes the Court to address them, the objecting party shall submit all unresolved objections and a sentencing memorandum to the Court no later than **May 18, 2021**. The Court will resolve disputes in accordance with §6A1.3 of the guidelines at the sentencing hearing.

13.     The parties are advised that in the absence of good cause, the Court will not allow witness testimony at sentencing except as authorized by Fed. R. Crim. P. 32(i).  The Court will not approve payment of witness fees and costs under Fed. R. Crim. P. 17(b) unless the witness testimony is authorized by Rule 32(i).  If either party intends to have witnesses testify at sentencing, the party must notify the Court and the opposing party, by filing a separate notification document, no later than **May 18, 2021**, of the identity of the witness and the scope and purpose of the intended testimony.  The requirement that the opposing party be notified of any intended testimony applies regardless of the language of Rule 17(b) contemplating ex parte application for witness subpoenas.

14.   Without leave of Court, the defendant may file no more than ten (10) letters of support.  Defendants wishing to file more than ten (10) letters must first seek leave of Court explaining why a greater number is necessary.  Letters in support shall be filed on or before **May 18, 2021**.

28

15.     Any responses to sentencing memoranda shall be filed on or before

**May 21, 2021**.

16.     Reply briefs will not be accepted for filing in sentencing matters.

17.     When judgment is entered in the criminal case, the clerk shall close

the civil file by entering judgment in favor of Lira and against the United States.

DATED this 18th day of March, 2021.

Donald W. Molloy, District Judge
United States District Court

cc:     USPO
        USMS
        CJA/W. Holton